# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-1355

_____

United States of America

*Plaintiff - Appellee*

v.

Nathan Wayne Smith

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Southern District of Iowa - Council Bluffs

_____

Submitted: September 11, 2014
Filed: November 12, 2014

_____

Before BENTON, MELLOY, and SHEPHERD, Circuit Judges.

_____

BENTON, Circuit Judge.

A jury convicted Nathan Wayne Smith of bank robbery in violation of 18 U.S.C. § 2113(a). He appeals, claiming the district court[1] committed constitutional error by allowing the jury to view a replay of video exhibits outside the presence of

_____

[1]The Honorable James E. Gritzner, Chief Judge, United States District Court for the Southern District of Iowa.

the defendant, and without notifying defense counsel. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

## I.

At about 9:30 am one June morning, a man entered a bank in Hamburg, Iowa. He wore a white visor, lightly tinted sunglasses, a gray or white baggy t-shirt, and dark baggy pants with black-and-white tennis shoes. He pushed a plastic bag at the teller and told her to "fill it up." Cameras recorded the robbery. A witness saw an early-90s Cadillac speeding away from the area of the bank. It had a dark green exterior and a light-colored vinyl top. The bank's outside ATM camera twice recorded a vehicle with this description.

Smith lived in Lexington, Missouri, a three-hour drive from Hamburg. He owned a dark green 1995 Cadillac with a light-colored vinyl top. It had an ignition interlock device, which, three-and-a-half hours after the robbery, was serviced in Missouri. The device showed that the car ran continuously from 6:30 am until 11:17 am, then again for shorter periods before 1:00 pm that day—the only time the car ran this long between February and July that year. Smith paid $175 cash for the service—$150.30 more than required by his lease.

Minutes after the service, an officer stopped Smith in the Cadillac for a registration violation. The officer's camera showed Smith wearing a light gray t-shirt. On the seat next to him were lightly tinted gold-rimmed sunglasses. Smith told the officer he was currently unemployed. The day after the robbery, Smith paid $1,475 cash for a car, without test-driving it. Seven days after the robbery, two bank tellers, viewing a six-person photo lineup, independently identified Smith as the robber. Days later, police searched his home, seizing a pair of black-and-white tennis shoes and a light colored T-shirt, like the robber's. They also found his Cadillac under a car cover with the license plates removed.

At issue are four video exhibits entered without objection and shown to the jury during trial. As the jury prepared to deliberate, the court told counsel: "All of the exhibits will go back. The videos, if the jury wishes to see them, we'll play them for them in the courtroom. Please make sure someone other than one of the attorneys is here to play those for us if we need that done."

During deliberation, the jury requested to view the four videos. The equipment to play them was in the courtroom. The jury came back to the courtroom. The judge and the court reporter were there. A staff member of the U.S. Attorney's office—who had played the videos at trial—played them for the jury.

> THE COURT: Take your seats.
>
> JUROR [#1]: Are we able to look at the smaller monitor?
>
> THE COURT: Take your seats.
>
> We are on the record, the Court having received a question from the jury, the question being, "We would like to see the three bank videos (not the ATM) and the Amer video from Buckner. We would [sic] a smaller screen versus the large monitor," and it's signed by the foreman, [Juror #3].
>
> The Court can certainly provide you with a chance to see those videos, and we'll do that in just a moment. I can't alter the way you were shown the videos during the trial. I will allow you, if you wish, to step closer to the monitor, because obviously some of you are closer than others.
>
> So if you wish to come out of the jury box and be closer to the monitor while they're being played, you're welcome to do that, but I will not be able to give you a different monitor to look at.
>
> JUROR [#2]: Can we look off of that monitor that the—
>
> THE COURT: That monitor will be there when you're standing over there.
>
> JUROR [#2]: Okay.

THE COURT: So if you want to come closer to the monitors, you may.

JUROR [#3]: I would say the people that have the biggest questions, get toward the front.

THE COURT: Don't tell me that.

Okay. Alright. Deb, would you just play them in order.

And then if you wish to see them again, tell me.

JUROR [#2]: And if we ask to stop, can she?

THE COURT: She will.

JUROR [#2]: Okay.

(Exhibit 2 played in open court.)

JUROR [#1]: Why don't we stop and back it up to about halfway in between.

THE COURT: Kelli, we don't need to record their discussion.

(Discussion off the record.)

THE COURT: Folks, avoid much discussion. Just tell us what you want to see.

Are you ready for the next video?

(Exhibit No. 3 played in open court.)

(Discussion off the record.)

THE COURT: Next one, please.

(Government exhibit 4 played in open court.)

THE COURT: And then you wanted the Officer Amer stop in Buckner.

(Government exhibit 12 played in open court.)

THE COURT: Anybody need to see anything again?

A JUROR:  No.

JURORS IN UNISON:  Thank you.

THE COURT:  Thank you, folks.

Twenty-one minutes after reviewing the videos, the jury reached its verdict.

II.

Smith argues the district court should have notified him and his counsel about the jury's request to replay the video evidence, giving him an opportunity to be present and heard on the issue.  He also contends that replaying the video exhibit to the jury is a critical trial stage triggering a right to be present under the Fifth and Sixth Amendments of the United States Constitution and Federal Rule of Criminal Procedure 43(a)(2).

The government argues that, even if the district court erred by replaying the videos without notifying Smith and his counsel, any error is reviewed only for plain error.  Although the district court briefly told counsel how it would address the jury's request to play the videos, the court did not indicate whether the defendant (or counsel) would be notified or given an opportunity to be heard.  Since Smith and his counsel had no chance to object to the replay, plain error is not the standard of review.  **Fed. R. Crim. P. 51(b)** ("If a party does not have an opportunity to object to a ruling or order, the absence of an objection does not later prejudice that party.").

"We review whether a trial court conducted a proceeding in violation of defendants' right to be present during every stage of trial under an abuse of discretion standard.  If a proceeding was conducted in violation of this right, it is subject to harmless error analysis."  *United States v. Barth*, 424 F.3d 752, 762 (8th Cir. 2005) (internal citations omitted).  *See Chapman v. California*, 386 U.S. 18, 24 (1967)

("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.").

"The Fifth and Sixth Amendments protect a criminal defendant's right to be present at all stages of the trial, and a trial court must provide the defense attorney with notice and a meaningful opportunity to object before responding to a question asked by the jury once deliberations begin." *Stewart v. Nix*, 972 F.2d 967, 971 (8th Cir. 1992) (internal citations omitted). "Communication between judge and jury in the absence of and without notice to the defendant creates a presumption of prejudice. Such presumption may be overcome, however, by a clear indication of a lack of prejudice." *Id.* (internal citations omitted). *See also* ***United States v. Olano***, 507 U.S. 725, 739 (1993) ("There may be cases where an intrusion should be presumed prejudicial . . . but a presumption of prejudice as opposed to a specific analysis does not change the ultimate inquiry: Did the intrusion affect the jury's deliberations and thereby its verdict?").

In *Shelton v. Purkett*, 563 F.3d 404 (8th Cir. 2009), this court addressed a trial court's grant of a "deliberating jury's request to view exhibits . . . without informing counsel that the court was communicating with the jury." *Id.* at 407-08. Although this court assumed that the communication *was* constitutional error, "[w]e questione[d] whether the act of handing over a previously admitted exhibit qualifies as the sort of 'presumptively prejudicial communication' *Stewart* addressed, as it seems more ministerial than substantive." *Id.* at 408. *See generally* ***United States v. Muhlenbruch***, 634 F.3d 987, 1001-02 (8th Cir. 2011) ("It is within the sound discretion of the trial court to determine whether to allow a jury to review properly admitted testimony or recordings during deliberations.").

Even if the district court abused its discretion by replaying the videos without notifying the defendant and his counsel, the error was harmless beyond a reasonable doubt. The district court was present during the replay, and the transcript shows no

prejudicial dialogue. Although what was said off the record is unknown, the court instructed the jury to avoid discussion and to "just tell us what you want to see." *See Yannacopoulos v. Gen. Dynamics Corp.*, 75 F.3d 1298, 1305 (8th Cir. 1996) ("It is certainly reasonable to believe, absent evidence to the contrary, that the jury adhered to the judge's instructions."). The jury was in the courtroom for a total of 11 minutes to view all four videos—which together last 7 minutes 45 seconds (and it appears one video was backed up and played halfway through again). Although a non-attorney IT specialist from the U.S. Attorney's office played the videos, the court instructed her what to play and when to play it.

Overwhelming evidence showed Smith committed the robbery. Two tellers independently identified him as the robber in a photo lineup a week after the robbery. He owned a unique Cadillac identical to the one used in the robbery (which soon had its license plates removed). The drive times on the ignition interlock device meshed with the robbery timeline. Despite claiming to be unemployed, he made large cash transactions within 24 hours after the robbery. Smith's clothing resembled the bank robber's.

Finally, Smith was present and did not object during trial when the court admitted the videos into evidence and they were played to the jury. Defense counsel played one video during his closing argument. This court finds beyond a reasonable doubt that the video replay outside of Smith's (and his counsel's) presence was harmless.[2]

---

[2]Neither this court nor the Supreme Court has directly addressed whether the replay of video evidence to a deliberating jury is a critical stage in trial. The circuits are split on this issue. *See United States v. Monserrate-Valentin*, 729 F.3d 31, 58 (1st Cir. 2013) (discussing cases). Since replaying the videos without notifying the defendant or his counsel was harmless beyond a reasonable doubt, this court need not address whether the replay is a critical trial stage. *See Rushen v. Spain*, 464 U.S. 114, 117-19 (1983) (holding the right to personal presence at all stages of trial is

\* \* \* \* \* \* \*

The judgment is affirmed.

_____

---

reviewed for harmless error); ***Rogers v. United States***, 422 U.S. 35, 40 (1975) ("[A] violation of Rule 43 may in some cases be harmless error.").